1
2
3
4
5
6               IN THE UNITED STATES DISTRICT COURT
7                    FOR THE DISTRICT OF ARIZONA
8
9  United States of America,            )  CR 13-0519-TUC-JGZ (LAB)
                                         )
10         Plaintiff,                    )  **REPORT AND RECOMMENDATION**
                                         )
11 vs.                                   )
                                         )
12                                       )
   Cruz Margarita Sanchez-Avitia,        )
13 Ignacio Tapia-Moreno,                 )
                                         )
14         Defendants.                   )
                                         )
15 _____ )

The District Court referred this case to the Magistrate Judge for a hearing on the defendant's motions to suppress.  The defendants, Cruz Margarita Sanchez-Avitia and Ignacio Tapia-Moreno, argue that their statements were taken in violation of *Miranda* and involuntarily. (Doc. 22).  They also argue that their Fourth Amendment rights were violated when they were unlawfully detained at the United States Border Patrol (USBP) checkpoint on March 1, 2013. (Doc. 23).  Defendant Tapia-Moreno filed a motion for joinder in Defendant Sanchez-Avitia's motions (Doc. 43) and a Supplement to Defendant's Notice of Joinder (Doc. 53).

An evidentiary hearing was held on February 20, 2014, March 10, 2014, and concluded on March 12, 2014.  On February 20, 2014, USBP Agents Edward Seed, Derek Merriman, Eric Griego, and Homeland Security Investigations (HSI) Special Agent (SA) Ricardo Ramirez testified. On March 10, 2014, HSI SA Ricardo Ramirez completed his testimony and HSI Intelligence Research Specialist (Specialist) Carlos Guido, USBP Agent Hector

Lopez, and Defendant Sanchez-Avitia testified. Government's Exhibits 1, 2, and 3 and Defense Exhibits 20, 21, 22, 23 and 24 were admitted.

**Charge:**

Defendants Sanchez-Avitia and Tapia-Moreno are charged by indictment with conspiracy to transport illegal aliens for profit, and three counts of transportation of illegal aliens for profit, in violation of Title 8 United States Code §§ 1324(a)(1)(A)(v)(I), 1324(a)(1)(A)(ii) and 1324(a)(1)(B)(i). (Doc. 7).

**Motions to Suppress:**

The defendants argue that they were in custody when their initial statements were taken without *Miranda* warnings, and that their statements, before and after *Miranda* warnings, were involuntary. They assert that their Fourth Amendment rights were violated when their detention was prolonged without probable cause, beyond the brief, initial questioning permitted at an immigration checkpoint. The defendants move to suppress all statements, including post-*Miranda* statements, and all evidence obtained as a result of the vehicle stop as the fruit of the unlawful seizure.

The Court concludes that the defendants were not in custody for purposes of *Miranda* when their initial statements were taken. Their pre- and post-*Miranda* statements were voluntary. Their detention and questioning at the checkpoint were legal. Probable cause was established prior to their arrests. The statements and evidence should not be suppressed and are admissible at trial.

**EVIDENCE:**

*Edward Seed*

Edward Seed testified that he has been a U.S. Border Patrol Agent for 6 years. On 3/1/13 at about 4:50 p.m., Agent Seed was working in primary inspection at the immigration checkpoint on Highway 90. A gray Ford Explorer with 7 occupants approached the checkpoint. Defendant Tapia-Moreno was the driver. Agent Seed identified Defendant Sanchez-Avitia as the front passenger. There were two teenagers in the middle seat and three younger children in the back seat. Agent Seed questioned Tapia-Moreno regarding his legal

1  status and also asked if the five children were United States (US) citizens. Agent Seed
2  thought is was odd that Tapia-Moreno turned his body toward the agent, used big hand
3  gestures and turned around quickly to look at the children when asked about them. Agent
4  Seed asked for the children's birth certificates. Tapia-Moreno became more nervous. Agent
5  Seed sent the vehicle to secondary inspection based on the odd behavior and also because
6  there was a lookout on the vehicle, which the agents learned about at muster just before their
7  shifts began.

8  Secondary inspection is about 50 yards away from the primary lanes. Agents Seed and
9  Merriman walked over to meet the vehicle at secondary.

10  During a conversation that lasted a couple of minutes, Agent Seed asked Tapia-Moreno
11  for the names and ages of the children and where each was seated in the vehicle. Tapia-
12  Moreno hesitated. Sanchez-Avitia answered for him. Tapia-Moreno was asked to step out
13  of the vehicle and was separated from the other occupants. Agent Merriman was present.
14  The tone of the conversation was casual, occurred in an open area, not in an enclosed
15  structure, and lasted for about 2 minutes.

16  Agent Seed then spoke with Sanchez-Avitia about Tapia-Moreno and the children. Agent
17  Griego was present. The conversation was casual and lasted about 2 minutes. Sanchez-
18  Avitia was either still in the vehicle or just outside of it. Sanchez-Avitia and Tapia-Moreno
19  gave inconsistent statements. Agent Seed spoke again with Tapia-Moreno and then with
20  Sanchez-Avitia for about a minute or two each. Sanchez-Avitia gave the agents permission
21  to speak with the children. Both defendants were arrested.

22  Agent Seed did not advise either defendant of his or her *Miranda* rights. The defendants
23  were not free to leave as there was an ongoing investigation.

24  ### ***Derek Merriman***

25  Derek Merriman testified that he has been a U.S. Border Patrol Agent for 3 years. On
26  3/1/13 he was assisting with primary inspection at the checkpoint on Highway 90 when a
27  gray Ford Expedition approached. The vehicle was at primary for a minute or two before it
28  was sent to secondary. Agents Merriman and Seed walked to secondary, about 50 feet away,

1 following the vehicle. Agent Merriman watched Agent Seed speak with the driver and
2 passenger. Agent Seed looked at the children's birth certificates and then gave them to
3 Agent Merriman at secondary. Agent Seed asked the driver to get out of the vehicle. Agent
4 Merriman asked the driver to walk with him. He identified the driver as Defendant Tapia-
5 Moreno. Agent Merriman spoke with Tapia-Moreno for about 5 minutes in a normal tone.
6 Tapia-Moreno was nervous, avoiding eye contact, unsure of his answers, and "dancing"
7 around. Agent Seed spoke with the passengers.

8 The agents shared the information they gathered, including that the teenage boy stated the
9 children in the back seat were not his family. Tapia-Moreno was left alone while the two
10 agents consulted with each other. Agent Merriman then confronted Tapia-Moreno with the
11 information. Tapia-Moreno admitted he did not know the three youngest children and that
12 they were illegal. At 5:09 p.m. Tapia-Moreno was handcuffed, arrested, read his rights, and
13 taken to a holding cell. Specialist Griego witnessed the rights. Tapia-Moreno said he
14 understood his rights. No further questions were asked. Specialist Griego then read
15 Sanchez-Avitia her rights while she sat in a service vehicle.

16 There were a total of six to seven uniformed, armed agents in the area, although not all
17 were visible.

18 ***Eric Griego***

19 Eric Griego testified that he has been a USBP Agent for just over 2 ½ years. On 3/1/13
20 there was a lookout for a Ford Explorer that was suspected of transporting undocumented
21 children. Agent Griego spotted the vehicle driving north while he was driving south on
22 Highway 90. He was called back to the checkpoint to assist with an investigation. When he
23 arrived, he saw a similar vehicle in secondary inspection with Agents Seed and Merriman
24 nearby. Agent Seed was on the passenger side. Agent Merriman was on the driver's side.
25 After being briefed by Agent Seed, Agent Griego was asked to speak with the passenger,
26 whom he identified as Defendant Sanchez-Avitia.

27 Agent Griego asked Sanchez-Avitia to get out of the vehicle and sit on a bench near the
28 passenger side. She was upset and acted as if she did not want to talk. She turned away,

made no eye contact, and gave brief answers, but she did answer questions. Agent Griego had the three birth certificates for the children. Sanchez-Avitia correctly answered biographical questions about the children. When Agent Griego saw Agent Merriman arrest Tapia-Moreno, Agent Griego arrested Sanchez-Avitia, handcuffing her and placing her in a Border Patrol car. Agent Griego read *Miranda* rights to her at 5:24 p.m. with another agent present. No more questions were asked.

### *Ricardo Ramirez*

Ricardo Ramirez testified that he has been a DHS HSI Agent for over 5 years. Prior to that he was a USBP Agent for 12 years. On 3/1/13 at about 5:00 p.m. he was asked to assist with a vehicle at the checkpoint. He was told by BPA Lopez that there may be undocumented aliens in a vehicle. This was part of an ongoing investigation of an organization suspected of transporting undocumented minor children. Agent Ramirez identified Tapia-Moreno as the person he interviewed after reading him his *Miranda* warnings, in a cell, in the trailer at the checkpoint. Agents Lopez was also in the cell with Tapia-Moreno. Agent Ramirez read aloud and explained in Spanish Exhibit 1, the rights form, line by line. He asked Tapia-Moreno if he had any questions and if he understood and would waive his rights. Tapia-Moreno signed the written waiver form. An interview was conducted, lasting about 20 to 25 minutes.

Agent Ramirez interviewed Sanchez-Avitia in another trailer, sitting at a desk, not in an enclosed cell. Agent Lopez and Specialist Guido were also present. Agent Ramirez read Sanchez-Avitia her rights in the same manner as he did for Tapia-Moreno. At Sanchez-Avitia's request, the interview and advice of rights were conducted in Spanish. Agent Ramirez is a native Spanish speaker. The interview lasted about 30 to 35 minutes and included questions about identifying people in photographs. Sanchez-Avitia was very helpful. She said she wanted to help. She admitted to numerous acts of alien smuggling. Agent Lopez told Sanchez-Avitia to be honest and tell the truth because it would look better, but he told her it was not in his power to help her. He told Sanchez-Avitia that he would include her cooperation in his report. Sanchez-Avitia was released that night.

1    Agent Ramirez did not witness any agent speak to Sanchez-Avitia about cooperating or
2 about taking the children home if she cooperated.  Toward the end of the interview, agents
3 spoke among themselves about calling Child Protective Services to take custody of the
4 children, and it is possible that Sancehz-Avitia overheard that conversation.

5 ### *Carlos Guido, Jr.*

6    Carlos Guido testified that he has been an Intelligence Research Specialist for
7 Immigration and Customs Enforcement (ICE) for over three years.  Prior to that he worked
8 for the Douglas Police Department for 25 years.  On 3/1/13 he was called at about 5:00 p.m.
9 to assist with an investigation at the checkpoint.  When he arrived, he spoke with Agents
10 Juarez, Ramirez, and Lopez regarding possible child alien smuggling.

11    Specialist Guido interviewed Sanchez-Avitia after Agent Ramirez read her the *Miranda*
12 warnings in Spanish.  He identified her in court.   The interview lasted 45 to 90 minutes and
13 was conducted after Sanchez-Avitia said she understood her rights and signed the waiver of
14 rights form. Specialist Guido was only absent from the interview for 3 to 5 minutes.  While
15 he was present, Sanchez-Avitia never asked for a lawyer nor did she hesitate to answer
16 questions.  The tone of the interview was comfortable and her answers were direct.  The
17 questions were asked primarily by Agents Ramirez and Lopez but Specialist Guido also
18 asked some questions.

19    The interview took place in a mobile office at the Border Patrol checkpoint with three
20 agents present.  There may have been other agents in the area who were in uniforms and
21 armed. The agents conducting the interview were in plain clothes and armed, but there was
22 no testimony whether the firearms were visible.  Specialist Guido brought a series of
23 photographs to show Sanchez-Avitia.  He always brings them when questioning suspected
24 child smugglers. Specialist Guido did not speak with Agents Seed, Merriman, or Griego and
25 did not know if Sanchez-Avitia had been advised of or had invoked her rights.  Specialist
26 Guido does not record interviews.  He usually takes notes, which he thinks he did in this

1 case, but he is not sure what he did with the notes.[1]

2 Specialist Guido first heard of Sanchez-Avitia 12 months earlier in relation to a criminal
3 investigation into child smuggling. He had some information prior to the interview which
4 suggested that Sanchez-Avitia had transported undocumented children in the United States.
5 Sanchez-Avitia was an investigative lead, not yet confirmed as a suspect.

### ***Hector Lopez***

Hector Lopez testified that he has been a Border Patrol Agent for over 10 years. On 3/1/13 he was working with HSI as a liaison with ICE. At about 5:00 p.m. Agent Juarez called and asked him to assist with an alien smuggling investigation at the checkpoint. When Agent Lopez arrived, he saw agents questioning the occupants of a vehicle that was pulled over. Agent Lopez identified both defendants in court. Tapia-Moreno was with the vehicle at secondary. Sanchez-Avitia was on the other side of the road.

When Border Patrol Agents finished their questioning, Agent Juarez was notified that he could begin his interviews. Agent Juarez told Agent Lopez that Border Patrol was finished with its investigation. Agent Juarez was directing the agents in their investigation. The first interview was of Tapia-Moreno and was conducted in Spanish in the Border Patrol mobile building in a detention cell. Other agents were in the building but in separate areas. Agent Ramirez read Tapia-Moreno his rights in Spanish. Tapia-Moreno said he understood his rights and signed the waiver form. (Ex. 1). Agent Ramirez asked the questions. The interview lasted about 40 minutes. Tapia-Moreno did not ask for a lawyer or to stop the questioning. The tone of the interview was pleasant and comfortable.

Sanchez-Avitia was advised of her rights, said she understood them and signed the waiver form. (Ex. 2). Her interview lasted about 40 minutes. She was not in a holding cell. She did not ask for a lawyer or to stop the questioning. The tone of the interview was pleasant and comfortable. Specialist Guido and Agent Lopez were present while Agent Ramirez asked

---

[1] Later in the hearing, AUSA DeJoe stated that Specialist Guido informed him that he did not take notes.

1 questions. Agent Lopez took notes as requested by Agent Ramirez.

2 Agent Lopez did not check with the other Border Patrol Agents before the interviews began. He did not know if the defendants were previously *Mirandized*. He is not sure if Sanchez-Avitia was handcuffed. He did not hear any agent tell Sanchez-Avitia anything about CPS or that it would be in her best interest to cooperate.

### *Cruz Margarita Sanchez-Avitia*

Cruz Margarita Sanchez-Avitia testified that Ignacio Tapia-Moreno has been her partner for 13 years. They have five children. Jocelyn Avitia is 17 years old. Manuel Avitia is 13 years old. Cecilia Tapia is 12 years old. Camila Tapia is 9 years old, and Carina Tapia is 5 years old. Ms. Sanchez-Avitia has been a lawful permanent resident of the United States for 17 years.

On 3/1/13 Ms. Sanchez-Avitia was in a Ford Expedition traveling from Sierra Vista, AZ with Mr. Tapia-Moreno driving. Jocelyn and Manuel Avitia were in the vehicle along with three other children, ages 5, 9 and 12. The vehicle was stopped at the immigration checkpoint at about 4:20 p.m. There were many officers there. The vehicle's occupants showed their identification documents to the officers, including Agent Seed. They were told to open the windows in the back and were asked who was in the back. They were asked if the children were U.S. citizens. Mr. Tapia-Moreno answered that the girls were his daughters and the children were all U.S. citizens. Ms. Sanchez-Avitia did not speak to Agent Seed.

The agents sent the vehicle to secondary inspection. There the agents asked both defendants questions while they were still in the vehicle. Ms. Sanchez-Avitia told the agents that the children were U.S. citizens. She was asked for and provided Agent Seed with the children's birth certificates. After about 15 minutes of questions Mr. Tapia-Moreno was asked to get out of the vehicle. Ms. Sanchez-Avitia was then asked to get out of the vehicle. She was not able to see where Mr. Tapia-Moreno was. She was out of the vehicle for about ½ hour while Agents Seed and Griego questioned her. Agent Griego questioned Ms. Sanchez-Avitia in Spanish about the children's ages, names and places of birth, which she

1  answered. She was also asked where the girls were from and who their parents were. Ms.
2  Sanchez-Avitia said she did not want to talk or answer questions. She had given Agent Seed
3  the birth certificates at secondary inspection while she was still in the vehicle.

4  Agent Griego did not tell Ms. Sanchez-Avitia she was under arrest. Agent Seed said she
5  was there because the girls were not theirs. The agents did not advise her of her rights. She
6  was told that Mr. Tapia-Moreno had talked. She was handcuffed and placed in a patrol car
7  where she waited for 20 to 30 minutes. Agent Ramirez then approached her and said he
8  would read her rights to her. Ms. Sanchez-Avitia asked about the children and Agent
9  Ramirez told her the family would be fine. He told her that it would be better for her and the
10 family to speak to the agents if she was involved in this. Ms. Sanchez-Avitia decided to
11 speak with the agents for her family's sake.

12 Agent Ramirez removed the handcuffs and read her rights. Ms. Sanchez-Avitia
13 understood a little of her rights. She doesn't remember if she was advised of her right to an
14 attorney, but she was not told she could consult with an attorney, although she knew that she
15 could. She was advised that she could remain silent. She remembers signing the waiver of
16 rights form and acknowledged that Agent Ramirez explained everything to her. She asked
17 about whether she could stop answering questions at any time, and Agent Ramirez said she
18 could. She was taken from the car to the trailer. She believes she was questioned from 6:00
19 p.m. until 10:00 p.m. but is not sure. Agents Lopez, Ramirez and Specialist Guido were
20 present during the interview. There was a time where she was alone with Specialist Guido.
21 He said they were going to take Ms. Sanchez-Avitia's residency papers from her immediately
22 and they would take the children. He explained that if she talked, CPS would not take the
23 children.

24 Ms. Sanchez-Avitia told Specialist Guido and Agent Ramirez that she did not want to
25 speak any more when she was shown the photographs. Agent Ramirez reminded her that she
26 had promised to tell the truth and she couldn't stop the interview when she wanted to because
27 they needed to know everything. Twice Ms. Sanchez-Avitia told the agents she didn't want
28 to continue to speak with them. Once was when they asked her how long she had been

- 9 -

1 smuggling children. She was told that if she didn't answer the questions then the family
2 would not be able to leave together. She continued to answer questions. At 10:00 p.m., after
3 four hours of interrogation, she was released with her family and allowed to go home.

4 On cross-examination Ms. Sanchez-Avitia acknowledged that she knows she will lose her
5 papers because of her involvement in this incident. She admitted that she lied to Agent Seed
6 when she said the younger children were hers and when she provided birth certificates that
7 do not belong to the children.

8 **DISCUSSION:**

9 The defendants concede that the original stop of the vehicle at the Border Patrol
10 checkpoint and questioning of the driver, Tapia-Moreno, and front passenger, Sanchez-
11 Avitia, was a lawful immigration inspection. They challenge the decision to send the vehicle
12 to secondary inspection and the length and manner of questioning. They argue that the
13 defendants were in custody for purposes of *Miranda* at the moment they were sent to
14 secondary inspection. Sanchez-Avitia argues that her *Miranda* waiver was involuntary and
15 that she invoked her rights when she was initially hesitant to answer questions and did not
16 answer one question. She claims that her statement was involuntary because the agents
17 threatened to call Child Protective Services (CPS) to take her children and warned her that
18 she would lose her lawful permanent residence status if she was arrested for alien smuggling.

19 **CUSTODY DETERMINATION, *MIRANDA*:**

20 The court concludes the defendants were not in custody for *Miranda* purposes until they
21 were handcuffed and formally arrested.

22 A custodial suspect's post-arrest statements given in response to interrogation are only
23 admissible in the government's case-in-chief if the statements are given after a knowing and
24 intelligent waiver of the suspect's *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 478-
25 79 (1966). However, the obligation to "administer Miranda warnings attaches . . . 'only
26 where there has been such a restriction on a person's freedom as to render him "in
27 custody."'" *Stansbury v. California*, 511 U.S. 318, 322 (1994), *quoting Oregon v.*
28 *Mathianson*, 429 U.S. 492, 495 (1977). To determine whether a person is "in custody" under

*Miranda*, "a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" *Stansbury*, 511 U.S. at 322, *citation omitted*. There are a number of scenarios where a person is "seized" by law enforcement for purposes of the Fourth Amendment but is not in custody for purposes of *Miranda*, although he is not free to leave. A traffic stop, a *Terry* stop-and-frisk, and a border inspection are all examples. *U.S. v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001), *citations omitted*.

Factors to be considered in determining whether a reasonable person would believe he was in custody include, (1) the language used to summon the individual; (2) the extent to which the individual is confronted with evidence of guilt; (3) the physical surroundings of the interrogation: (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002), *quoting United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001), *cert. denied*, 122 S.Ct. 1117 (2002) Other factors may be relevant or dispositive of the inquiry. *Id*.

In looking at the "totality of the circumstances," the Court notes first that the defendants voluntarily approached the checkpoint knowing they would come into contact with federal agents and would be subject to questioning. When they were referred to secondary inspection, Mr. Tapia-Moreno was driving and still in control of the vehicle while the agents walked behind it. When they reached secondary, the defendants were asked to step out of the vehicle and were separated from each other and the children. Tapia-Moreno was left alone for a short time, unrestrained, while the agents conferred. Sanchez-Avitia sat on a bench next to the vehicle and gave permission to the agents to speak with the children. The first factor supports a finding that the defendants were not in custody for *Miranda* purposes until formal arrest.

Neither defendant was confronted with evidence of guilt until just before formal arrest. At this point, Tapia-Moreno was told by Agent Merriman that Manuel Avitia stated that the girls were not part of his family. Tapia-Moreno admitted the children were not his and were

- 11 -

1  illegal. He was handcuffed, at which time he was arrested and clearly in custody.

2  The agents informed Sanchez-Avitia of the inconsistencies between her answers and Tapia-Moreno's answers, but she was not confronted with specific evidence of guilt until later when she was told that Tapia-Moreno had confessed. This factor also supports a finding that the defendants were not in custody until their formal arrest.

6  The duration of detention was about 2 minutes at primary inspection. At secondary inspection, the defendants were questioned together in their vehicle for a couple of minutes. Agent Merriman spoke with Tapia-Moreno alone for about 5 minutes. Agent Seed spoke with Sanchez-Avitia for about 2 minutes. He then spoke with Tapia-Moreno for a minute or two and questioned Sanchez-Avitia for another couple of minutes. From the time the vehicle initially approached the checkpoint until the defendants were handcuffed and arrested, about 20 minutes passed. The duration of the detention supports a finding that the defendants were not in custody until their formal arrest.

14  The defendants were initially questioned at primary inspection while they were in their vehicle. They were referred to secondary inspection, approximately 50 yards away, where they were briefly questioned again while still in their vehicle. Once they were removed from the vehicle, Tapia-Moreno was walked about 20 yards back toward primary inspection. Sanchez-Avitia was seated on a bench near the vehicle. They were outside, not in an enclosed area, not physically restrained and within public view. This factor supports a finding that the defendants were not in custody until formal arrest.

21  The degree of pressure applied to detain the individuals before they were handcuffed and formally arrested was not excessive. The defendants chose to travel this route, knowing they would encounter a checkpoint. Once at the checkpoint, they were asked routine questions and then asked to proceed to secondary inspection. They were asked to exit the vehicle and were separated from each other. At this point, they were in the presence of uniformed, armed agents who had possession of their documents and their children's birth certificates.

27  The degree of pressure experienced by the defendants was not significantly different from that experienced at a routine traffic stop where a uniformed, armed police officer asks a

1  driver to get out of the vehicle and takes the driver's license to run a computer check.  The
2  degree of pressure factor supports a finding that the defendants were out of custody until
3  arrest.

4  The court concludes that the defendants were not in custody for *Miranda* purposes until
5  they were formally arrested.  The government's failure to give *Miranda* warning before that
6  time does not make the defendants' statements inadmissible.

7  **INVOCATION OF *MIRANDA*:**

8  Sanchez-Avitia further argues that she invoked her *Miranda* rights during this initial
9  questioning period by her demonstrated reluctance to cooperate.

10  Agent Griego testified that he could tell Sanchez-Avitia did not want to answer questions
11  because she turned away, made no eye contact and gave brief answers. However, she
12  answered nearly all the questions asked.

13  A defendant's reluctance or even silence in the face of questioning does not as a matter
14  of law invoke the right to remain silent. *Berghuis v. Thompkins*, 560 U.S. 370, 382, 130
15  S.Ct. 2250, 2260 (2010).  Neither does it trigger in the agents a duty to end the interrogation
16  or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights.
17  *Id*.  In this case, Sanchez-Avitia did not say she wanted to remain silent or that she did not
18  want to talk to the police.  She did not invoke her rights under *Miranda* by her reluctance to
19  answer the agents' questions.

20
21

22  **VOLUNTARINESS:**

23  Sanchez-Avitia further argues her *Miranda* waiver and subsequent statements were made
24  involuntarily because she was threatened with losing her legal status in the United States and
25  with losing her children to CPS.  Although Defendant Tapia-Moreno joined in Defendant
26  Sanchez-Avitia's motions, he did not argue that his statements were involuntary.

27  An incriminating statement obtained during a custodial interrogation is only admissible
28  if there has been a knowing, intelligent, and voluntary waiver of *Miranda* rights.  *Miranda*

- 13 -

*v. Arizona*, 384 U.S. 436, 444 (1966).   The courts look at the totality of the circumstances to determine if a *Miranda* waiver is voluntary, knowing, and intelligent.   *U.S. v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) (citations omitted). The waiver is voluntary if it is the result of free choice and not because of coercion or promises.  *Id*. at 1128. The waiver is knowing and intelligent if the defendant was fully aware of the nature of the right he was waiving and the consequences of his decision to abandon the right. *U.S. v. Rodriguez-Preciado, supra*. at 1127. The government has the burden to prove a valid waiver by a preponderance of the evidence in order to overcome the presumption against a waiver. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

Involuntariness will not be found unless the government engages in behavior sufficiently severe to overbear the will of the defendant. Even where agents promise to inform the prosecutor of cooperation and to recommend leniency to induce a confession, such tactics do not establish involuntariness.  *U.S. v. Coleman*, 208 F.3d 786, 791 (9th Cir. 2000); *U.S. v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). Accusing a suspect of lying also does not render a confession involuntary.  *U.S. v. Wolf*, 813 F.2d 970, 975 (9th Cir. 1987).

There is no disagreement that once Sanchez-Avitia was handcuffed and arrested she was advised of and waived her *Miranda* rights. She signed a written waiver (Ex. 2) which states in Spanish that she waived her rights freely and voluntarily without threat or intimidation or promises.

At some point, there was a discussion among the agents about calling CPS to take custody of the children, and Sanchez-Avitia may have heard that.  It is unclear if the agents spoke about the fact that Sanchez-Avitia would lose her legal residency in the United States.  Agent Ramirez told Sanchez-Avitia that it would look better if she told the truth, and he would note her cooperation in his report.  He told her he had no ability to help her directly.

Based on the totality of the circumstance, the court concludes that the government's behavior was not so coercive as to render Sanchez-Avitia's *Miranda* waiver or her subsequent statements involuntary.

Sanchez-Avitia further argues that at some point after *Miranda* was read, she invoked her

1 right to remain silent by failing to answer one of the agents' questions. As the court
2 explained above, however, the invocation of *Miranda* must be done unambiguously.
3 *Berghuis v. Thompkins*, 560 U.S. 370, 382, 130 S.Ct. 2250, 2260 (2010); *U.S. v. Lorenzo*,
4 570 F.2d 294, 298 (9th Cir. 1978).

5 **FOURTH AMENDMENT:**

6 The defendants further argue that all statements and evidence in this case should be
7 suppressed because they were taken in violation of the Fourth Amendment right to be free
8 from unreasonable search and seizure.

9 The defendants first argue their rights were violated when they were referred to secondary
10 inspection without reasonable suspicion. The court does not agree.

11 While a vehicle stop at an immigration checkpoint is a "seizure", stops and questioning
12 at a checkpoint may be made without any individualized suspicion for Fourth Amendment
13 purposes. *U.S. v. Martinez-Fuente*, 428 U.S. 543, 556, and 562 (1976). A vehicle may be
14 referred to secondary inspection for further questioning without individualized suspicion of
15 criminal activity. *Id*.

16 The defendants argue their extended questioning at secondary was unreasonable. The
17 court concludes that while their detention at secondary was extended somewhat, the agents
18 had reasonable suspicion to justify the scope of the detention.

19 A brief detention at a Border Patrol checkpoint is Constitutional, even if it extends beyond
20 the time required for immigration inspection, if there is articulable suspicion or a minimal
21 showing of suspicion of criminal activity." *U.S. v. Taylor*, 934 F.2d 218, 220-21 (9th Cir.
22 1991), *cert. denied*, 502 U.S. 1074 (1992). Erratic behavior or increasing nervousness is a
23 sufficient basis. *U.S. v. Wilson*, 7 F.3d 828, 834 (9th Cir. 1993).

24 The agents testified that Tapia-Moreno behaved strangely and was increasingly nervous.
25 Both defendants gave inconsistent answers to the agents' questions. Within about 20 minutes
26 after the original stop of the vehicle at primary inspection, the teen-aged son stated that the
27 girls in the vehicle were not his family. Shortly after the vehicle was referred to secondary
28 inspection, the agents developed reasonable suspicion and then probable cause to arrest the

1  defendants. The defendants' Fourth Amendment rights were not violated.

2  **CONCLUSION:**

3  In considering the "totality of the circumstances", the Court finds that prior to the
4  defendants being handcuffed and formally arrested, they were not in custody for purposes
5  of *Miranda*. The agents were not required to read the defendants their rights prior to asking
6  questions at the immigration checkpoint. Once the defendants were taken into custody, they
7  were advised of their rights. All statements were given in accordance with *Miranda*.

8  Tapia-Moreno did not challenge the voluntariness of his statements. Sanchez-Avitia's
9  statements were made voluntarily. She was advised of and waived her rights voluntarily.
10 There is no evidence of coercive police activity or any indication that Sanchez-Avitia
11 attempted to invoke her rights at any time during the interrogation.

12 The detention of the vehicle from the time it approached primary inspection at the
13 checkpoint until the defendants were arrested was not unduly prolonged. At secondary
14 inspection, if not before, the agents developed a minimal showing of suspicion of criminal
15 activity, sufficient to justify the 20 minute delay. There is no dispute that the inspection was
16 to investigate alien smuggling.

18 **RECOMMENDATION:**

19 In view of the foregoing, it is recommended that, after its independent review of the
20 record, the District Court **DENY** the motions to suppress (Docs. 22, 23, 43, 53). Statements
21 and evidence acquired as a result of the stop of the vehicle and interrogation of the
22 defendants should not be suppressed.

23 Defense counsel may serve and file written objections within 14 days. If objections
24 are not timely filed, the party's right to de novo review may be waived.

25 The Clerk of the Court is directed to send a copy of this Report and Recommendation
26 to all parties.

27 DATED this 26th day of March, 2014.  Leslie A. Bowman
28                                       United States Magistrate Judge